IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

DARRYL HAUGHTON,                        )
                                       )
          Plaintiff,                   )
v.                                     )          No.  3-03-0768
                                       )          Judge Nixon
ORCHID AUTOMATION SYSTEMS, INC.,       )          Magistrate Judge Griffin
d/b/a ORCHID AUTOMATION,               )
                                       )
          Defendant.                   )

## ORDER AND MEMORANDUM

Pending before the Court is Defendant's Motion for Summary Judgment (Doc. No. 17),

filed with a supporting memorandum (Doc. No. 18), to which Plaintiff has responded (Doc. No.

22), and Defendant has replied (Doc. No. 27).  Also pending is Plaintiff's Motion to Consider

Additional Evidence in Support of Response to Defendant's Motion for Summary Judgment

(Doc. No. 29), to which Defendant has responded (Doc. No. 32).  For the reasons below,

Defendant's motion for summary judgment is GRANTED and Plaintiff's evidentiary motion is

GRANTED in part and DENIED in part.


I        Background

Plaintiff Darryl Haughton ("Haughton" or "Plaintiff") brings this suit against his former

employer, Defendant Orchid Automation Systems, Inc., d/b/a Orchid Automation ("Orchid" or

"Defendant").  Plaintiff alleges that Defendant discriminated against him in violation of Title VII

of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. ("Title VII"), and 42 U.S.C. § 1981

-1-

("Section 1981"), while he was employed by Defendant. While different theories of

discrimination are set forth in the complaint, Plaintiff's response to Defendant's motion for

summary judgment states that this claim is based on a theory of disparate treatment or intentional

discrimination.

Plaintiff is a Black male who worked at an Orchid manufacturing facility ("the facility")

in Gordonsville, Tennessee, from January 2000 to September 2001. There are three shifts at the

facility, and each shift has a "Team Leader" who leads the assembly line, or "team." Team

Leaders are responsible for producing quality parts, helping employees produce quality parts,

ensuring a safe work environment, and ensuring productivity. Haughton was hired as a

temporary employee through the Randstad employment agency as an assembly worker on the

second shift. Haughton worked in this capacity for approximately nine weeks. On February 21,

2000, Orchid hired Haughton in a permanent capacity as a Team Leader for the first shift.

Plaintiff was interviewed and hired for this position by Ron Hall ("Hall"), Production Manager,

and Craig Woodard ("Woodard"), Operations Manager.

Prior to September 15, 2001, Woodard and Hall, as well as Plant Manager Rick Powers

("Powers"), all considered Plaintiff to be "a very good employee," and Orchid had not received

any complaints about Plaintiff from the employees on his team. However, on Saturday,

September 15, 2001, it was brought to Hall's attention that Plaintiff used profanity and acted

abusively after Teresa Craighead ("Craighead") and Wanda Haney ("Haney"), two employees on

his team, asked Plaintiff to bring a part to their work station. Craighead and Haney called Hall at

his home from the facility and informed him that Plaintiff had responded to their requests by

yelling, "Can't you see I'm fucking busy?" and "I'm tired of those stupid bitches tell [sic] me

when I need to get them." Hall told Craighead and Haney to report their concerns to Powers first thing the following Monday morning.

The following Monday, September 17, 2001, Powers instructed Hall and Norma McClard ("McClard"), an Administrative Assistant, to conduct an investigation concerning Craighead's and Haney's allegations. That day, and the following day, Hall and McClard interviewed employees on Plaintiff's shift who were present during the incident with Craighead and Haney. Written statements[1] were taken from each of the employees during the interviews describing the incident and their concerns with Haughton as Team Leader.

Craighead's and Haney's joint statement reports that Haughton said to them: "I heard you the fucking first time, I'm not fucking deaf. And I said stop, fucking dumb asses."; "Bring me the fucking rails, bring me the fucking rails," and; he was "tired of this fucking running off the line." Their statement also indicates: Plaintiff has repeatedly said he will "call [the] NAACP if the damn fucking people in the office fire him;" that Craighead and Haney are fearful all the time; they do not work weekends because of Haughton; and they will not work with Haughton any more.

Hall and McClard also interviewed Haughton. McClard took notes of the interview; however, these notes were not included in the record. Plaintiff apparently denied the employees' allegations, and asserted that he responded to Craighead and Haney by stating he "wasn't going to get their parts no damn faster than [he] could bring them." At the end of this interview, Plaintiff was placed on paid leave, and told to depart the facility and remove himself from the

---

[1]While the parties refer to these documents as written statements, they appear to be handwritten notes of the interviews that the employees either signed or initialed.

Case 3:03-cv-00768   Document 38   Filed 07/27/05   Page 3 of 27 PageID #: 3

situation to give time for the matter to be investigated.

There are six other employee statements from the investigation in the record. Employee Ferhart Ibrahim stated that although he "tries to stay out of things," he heard Haughton use the phrase "fucking dumb ass" during the incident with Craighead and Haney. Employee Stacie Baines stated that she heard Plaintiff "cussing" during the incident. Stacie Barnes further stated that she feels like her job would be "on the line" if she were to complain, that Haughton "could make it harder on her," that he has "yelled" at employees "in front of everyone," and that his "actions causes [sic] tension."

Employee Judy Ray stated that Plaintiff once said, "God damn, can't you see I'm busy?" after she informed him of an injury. Employee Tina Gann stated that on the day of the incident she had heard Plaintiff say "fucking" and "damn," but did not hear him say "dumb ass." Tina Gann stated that on other occasions, Haughton has "cussed," including saying, "God damn, just leave shit alone." She also reported that she and other employees felt intimidated because Plaintiff is "Black and will call [the] NAACP," that "he creates tension," that "she hates coming to work," and "she knows he will make it hard on her."

Employee Rhonda Green reported that she overheard Haughton tell an employee that he was tired of that employee's "smart ass mouth." Notes in Rhonda Green's statement also include: "wanted to go to [third shift] because of [Haughton];" "if he gets mad at one person, mad at everyone"; "hasn't cussed [Craighead and Haney] until Saturday;" and "would have found another job if she could not have gone to [third shift], but things are better," "and doesn't want him fired, but he should be talked to." Finally, employee Donna Smith reported that on the day of the incident, Plaintiff stated he would "get the rails when he was good fucking ready.

-4-

Some people need to keep their damn mouth shut. I hold everyone's job in my hands." Donna Smith's statement reads she "feels intimidated by him - mood swings from happy go lucky to cussing," and she "has felt that she did not want to come to work because of his moods."

Hall stated in his deposition that, in these interviews, employees also reported that Plaintiff would falsify employees' time cards. According to Hall, employees reported that if they "minded" Haughton, he would "clock them in" if they were late to work in order to prevent them from "getting points" on Orchid's absenteeism system. Hall further stated that employees reported that Haughton would cause employees that either did not do what Haughton told them or reported Haughton's behavior to management to incur "points." Haughton disputes that he ever falsified an employee's time card.

On Wednesday, September 19, 2001, Hall, Powers, and Haughton met at a local park. Hall and Powers told Haughton that two employees were planning to quit their positions if Orchid did not do something about the situation. Haughton was given another opportunity to tell his version of the story. Haughton denied the various allegations against him and stated that he had no idea why his subordinates were making the allegations. Haughton also offered to either move to third shift or resign as a Team Leader and work on the line as an Assembler, and offered to apologize to his team. At the end of the meeting, Powers and Hall told Plaintiff that they were going to continue with their investigation and would be in touch with Plaintiff.

After that meeting, Woodard, Powers, Hall, and McClard discussed further the situation with Haughton. Woodard then met with Craighead and Haney who, according to Woodard, both reiterated that they would rather quit their jobs than work with Haughton again. Thereafter, Woodard, Powers, and Hall agreed to terminate Haughton's employment. On Friday, September

-5-

21, 2001, Plaintiff called Orchid and spoke to Hall. During that conversation, Hall informed Plaintiff that he was terminated. An Orchid Payroll/Status Change Notice dated September 19, 2001, indicates: "Darryl Haughton was terminated 9/19/01 for inappropriate conduct in team leader role." (Doc. No. 20, Ex. 13).

While Plaintiff admits he cursed at employees, he asserts that Michael Hughes ("Hughes"), a former Team Leader who is White, was not disciplined as severely as he was for equally, if not more, inappropriate workplace conduct. Hughes was a Team Leader on the second shift. He was promoted to that position on a temporary, trial basis. While working as the Team Leader, employees working on Hughes' line complained to Orchid management that Hughes was showing favoritism to a female employee on his line and his brother, Ronnie "Twinkie" Hughes ("Twinkie"), also an employee on his line.

Powers and Hall conducted an investigation as a result of these complaints, in which statements were taken from employees working on Hughes' team. It appears that in these interviews, the employees were asked if Hughes "plays favorites" or "shows favoritism" to certain employees on his line and whether there were any other problems.

The statement of employee Te§rika Faux ("Faux") describes an incident in which she apparently requested that Twinkie relieve her from the line so she could use the bathroom. Twinkie apparently refused, but then took a break and went to the break room without relieving her. Faux stated that she, "didn't mean to stir up conflict," that "Twinkie has run of places [Hughes] lets him," and that she "hate[s] coming in this place now - I get talked to like an idiot, insults coming from [Hughes]." Faux further stated that "it probably would not get as bad if I could keep my mouth shut," and that it "wouldn't make it any better to fire Twinkie [and Hughes

-6-

because] there would be resentment from the others." Then, Faux indicated that she "has had conflict with people because I let my mouth run-off."

Employee Colleen Knox's statement indicates that Hughes plays favorites with Twinkie, and often makes Faux wait to use the bathroom. In response to the favoritism question, employee Daniel McEbath's statement indicates, "in a way yes, but then again no," and that Hughes "probably does show some favoritism to Twinkie." Daniel McEbath also stated that there are problems between Faux and Hughes and between Faux and Twinkie, and that some people, but not others, have to wait 20-30 minutes to use the bathroom. Employees Glenn Cowan and Sherry Jones stated that Hughes shows some favoritism to his brother.

Employee Johnny Likens denied that Hughes showed any favoritism or that there were any problems. Employee Joe Bennett stated that Hughes favors his brother, but is a "good Team Leader and easy to get along with." Employee Stephanie Kimble stated that Hughes showed favoritism toward his brother and that Hughes and Faux "have a problem," but Hughes "is trying to be a good Team Leader." Finally, employee Judy Ray stated that Hughes doesn't show favoritism toward Twinkie, but rather Twinkie takes advantage of him; Twinkie "provokes" [Faux]; and that Hughes needs to get Faux relieved to use the restroom because she is a diabetic.

Twinkie was also interviewed. He elaborated on problems he had with Faux and indicated that Hall and Hughes had told him to "stay away from" Faux. Twinkie stated that his brother, Hughes, did not treat him differently than the others, but admitted that Hughes would often allow Twinkie's wife and child to visit him at work. There is no mentioned of alleged favoritism toward a female employee in any of the statements; however, Hall indicated in his deposition that he and Powers met with the female and she told them that "nothing was going

-7-

on."

Powers and Hall also met with Hughes to discuss the allegations of Hughes'
subordinates. Hughes' statement related that there were problems with Faux on the line, but
denied the allegations of favoritism. He stated that he "discipline[s Twinkie] like everybody
else," and stated that he allowed Twinkie's wife and child to visit him at work and that he did not
realize that there was a policy against that. In his deposition, Hall states that Hughes was
forthcoming about the allegations, that Twinkie "did get, you know, better treatment," and
"admitted up to what he had done." After the investigation, Powers and Hall removed Hughes
from the Team Leader position and placed him back on the line as an Assembler.

Plaintiff alleges that Hughes acted inappropriately in his role as Team Leader at other
times and in other ways. Plaintiff offers Faux's affidavit which states that "cursing on the plant
floor was an everyday occurrence as far as expletives such as 'damn' being uttered by most, if
not all employees, including Michael Hughes." Faux further states Hughes would often direct
"much harsher vulgarities" at the employees he was supervising, including her. She also states
that she, along with other employees, "would routinely complain" to Orchid management about
Hughes' "use of coarse language, but also instances where he would talk in a degrading manner
to employees in his line and how he would neglect his duties to play on the internet." According
to Faux, in April or May of 2001, when Faux was three months pregnant, Hughes stated
"something derogatory to [her] while [she] was working and he was her acting supervisor." Faux
alleges that she "told him that [she] did not have to tolerate that kind of treatment, to which
Hughes responded, "If I wasn't a team leader, I'd knock the fuck right out of you." Faux states
that she immediately reported this incident, including Hughes' remarks, to Powers and Hall who

-8-

advised that they would "handle it."

Former Orchid employee Terri Christian also provided an affidavit describing Hughes' behavior. She stated: "Hughes seemed to always speak in an abusive, overly-authoritative and derogatory manner to the employees he was supervising. However, he would give preferential treatment to his friends such as Johnny Johnson in the form of extra breaks." Christian states that she has heard Hughes say to employees, "If you are not back in five minutes, I'll fuckin' write you up." Christian also states she was aware that "many of the Orchid employees on second shift including Terika Faux and Daniel McElrath complained" to Orchid management about Hughes' "use of coarse language and about instances where he would talk in a degrading manner to employees in his line."

At one point, Hall asked Haughton to work as Team Leader on the second shift "to see what the problem was," and "if, in fact, the problem was Michael Hughes or was the workers." Haughton remained in that position for approximately two weeks. Plaintiff states that he inquired as to the nature of the problems, and Hall indicated to him that "there were threats issued by Michael Hughes to the workers, favoritism toward some employees, and the fact that productivity was low." According to Plaintiff, employees on the second shift shared with him the following concerns about Hughes. First, employees Faux, Terri Christian, Daniel McElrath, and Lee Hall told Plaintiff that Hughes had told them that "[Hughes] was in control of their jobs" and "[Hughes] had their jobs in his hands." Second, Stephanie Kimball and Terri Christian told Plaintiff that Hughes had "cursed" at them. Finally, an employee, whose name Plaintiff does not recall, told Haughton that Hughes had stated, "[Hughes] could fire them." Haughton alleges that he recounted these complaints to Hall. Haughton stated that he did not remember "exactly what

-9-

[Hall] said, but that [Hall] "wasn't pleased," and that [Hall] told Haughton to "see what [he] could do with that shift to get them up to productivity."


## II        Standard of Review

Summary judgment is appropriate when there is "no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  Generally, summary judgment is proper where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Canderm Pharmacal, Ltd. v. Elder Pharm., Inc., 862 F.2d 597, 601 (6th Cir. 1998), quoting Fed. R. Civ. P. 56(c).  All the facts and the reasonable inferences to be drawn from those facts must be viewed in the light most favorable to the non-moving party.  See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).  "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge . . . .  The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986);  see also Wexler v. White's Fine Furniture, Inc., 317 F.3d 564, 573 (6th Cir. 2003) (en banc).

In order to succeed, the moving party must show that there is an absence of evidence to support the non-moving party's case and that "the evidence is so one-sided that one party must prevail as a matter of law."  Lexington-South Elkhorn Water Dist. v. City of Wilmore, 93 F.3d 230, 233 (6th Cir. 1996).  A movant for summary judgment makes a sufficient showing by

-10-

informing the court of the basis of its motion and by identifying the portions of the record which reveal there are no genuine material fact issues to support the non-movant's case. See Celotex v. Catrett, 477 U.S. 317, 323 (1986). Once the movant makes this showing, the non-movant must then direct the court's attention to evidence in the record sufficient to establish that there is a genuine issue of material fact for trial. See id.

The non-movant, however, may not rely solely on conclusory allegations in the complaint to defeat a motion for summary judgment, but must come forward with affirmative evidence that establishes its claims and raises genuine issues of material fact. Id. at 324. The "mere possibility" of a factual dispute is not enough. Gregg v. Allen-Bradley Co., 801 F.2d 859, 863 (6th Cir. 1986). A genuine issue of material fact is one which, if proven at trial, would lead a reasonable fact finder to find in favor of the non-moving party. Anderson, 477 U.S. at 247-48. The substantive law involved in the case will underscore which facts are material and only disputes over outcome-determinative facts will bar a grant of summary judgment. Id. at 248.

Where the defendant demonstrates that after a reasonable period of discovery the plaintiff is unable to produce sufficient evidence beyond the bare allegations of the complaint to support an essential element of his or her case, summary judgment should be granted. See Celotex, 477 U.S. at 317. "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." Street v. J.C. Bradford & Co., 886 F.2d 1472, 1478 (6th Cir. 1989) (citations omitted). On the other hand, if this Court determines that a reasonable fact finder would be able to return a verdict for the non-moving party, it must deny summary judgment. See Matsushita, 475 U.S. at 249-50.

-11-

### III    Pending Evidentiary Issues

First, Plaintiff objects to the use of the employee statements, paragraphs 25-29, 38-61, 85, 115, 118, and 120 of Defendant's Statement of Undisputed Facts, arguing that these statements are inadmissable hearsay.  Defendant argues that they are not hearsay statements because they are offered to (1) show that employee reports about Plaintiff's and Hughes' behavior were made; (2) to demonstrate what information Orchid had available when investigating the incidents; and (3) to explain Orchid's motivation.

Documents submitted in support of a motion for summary judgment must either satisfy the requirements of Rule 56(e) of the Federal Rules of Civil Procedure or be disregarded.  See Moore v. Holbrook, 2 F.3d 697, 699 (6th Cir. 1993).  Rule 56(e) requires that affidavits in support of, or in opposition to, a motion for summary judgment be made on personal knowledge and to set forth such facts as would be admissible into evidence.  See Fed. R. Civ. P. 56(e).  Hearsay statements, those offered to prove the truth of the matter asserted, are inadmissable.  See Fed. R. Evid. 801(c).   As the statements that Plaintiff objects to are offered to show state of mind and motive, rather than the truth of the matter asserted, they are not hearsay statements and are properly admissible.  See King v. Techumseh Pub. Sch., 229 F.3d 1152 (Table), available at 2000 WL 1256899, at *5 (6th Cir. July 13, 2000) (admitting statements offered to "explain [the defendant's] reasonable belief that [the plaintiff] was having problems and the reasons [the defendant] took action against [the plaintiff]--in other words, state of mind, instead of truth").

Second, Plaintiff has filed a motion to consider additional information, specifically the affidavit of former Orchid employee Terri Christian.  Plaintiff states that despite due diligence of Plaintiff's attorney, Plaintiff did not receive the Christian affidavit until January 6, 2005,

-12-

approximately five weeks after the deadline for filing dispositive motions (See Doc. No. 16). Defendant objects, stating that there is not good cause for Plaintiff's delay and, additionally, that the affidavit sets forth inadmissable hearsay. The Court finds that Plaintiff has made a proper showing of good cause for the delay, and so the Court will consider the additional information.

One portion of the affidavit, however, will not be considered in ruling on the motion for summary judgment. Christian states that she was "aware that many of the Orchid employees on second shift including Terika Faux and Daniel McElrath complained to Ron Hall, Rick Powers, and Norma in the [human resources] Department about Michael Hughes' use of coarse language and about instances where he would talk in a degrading manner to employees in his line." (Christian Aff. ¶ 6). Plaintiff states that this portion is offered to prove that "despite Defendant's current denial that they had knowledge of Mr. Hughes' abusive treatment of his subordinates, Orchid's management, did indeed, have such knowledge."

This portion of Christian's affidavit does not meet the requirements of Rule 56(e) as it does not set forth any personal knowledge of the complaints. Christian does not indicate how she was aware of the employee complaints; she does not indicate, for example, that she was present while employees complained or that her awareness came as a result of mere workplace rumors. See Ward v. First Fed. Sav. Bank 173 F.3d 611, 618 (7th Cir. 1999) (affidavit failed to establish an individual's personal knowledge where it "merely asserts that [the individual] is 'aware' of the alleged instruction" and "does not reveal the source of [the individual's] awareness"). As such, paragraph six of Christian's affidavit will not be considered in ruling on the motion for summary judgment.

-13-

The third and final evidentiary issue relates to Faux's affidavit.  Faux indicates that "myself and many of my fellow employees at the time, including Stephanie Kimball, Dan McElrath, Joe Bennett and Judy Ray, would routinely complain to Ron Hall, Rick Powers and Norma in the HR Department not only about Michael Hughes' use of coarse language, but also about instances where he would talk in a degrading manner to employees in his line and how he would neglect his duties to play on the internet." (Faux Aff. ¶ 6).  The portion of this statement that indicates that other employees routinely complained to Orchid about Hughes also cannot be considered, as with regard to Christian, the personal knowledge requirement has not been met. Faux's affidavit does not indicate whether she was present during these routine complaints of others, or how she otherwise had knowledge of others' complaints.  As such, the portion of paragraph six describing other employees' complaints is inadmissable and will not be considered in ruling on the motion for summary judgment.


**IV      Analysis**

Title VII prohibits employment discrimination on the basis of race, while Section 1981 prohibits racial discrimination in the making and enforcing of private contracts.  A plaintiff may establish a prima facie case of discrimination under either statute by direct or indirect evidence. See Kline v. Tenn. Valley Auth., 128 F.3d 337, 348 (6th Cir. 1997).  Claims relying on indirect evidence of discrimination are evaluated under the McDonnell Douglas burden-shifting analysis. See McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973);  EEOC v. Avery Dennison Corp., 104 F.3d 858, 862 (6th Cir. 1997); see also Patterson v. McLean Credit Union, 491 U.S. 164, 186 (1989) (applying McDonnell Douglass analysis to Section 1981 context); Newman v. Fed.

-14-

Express Corp. 266 F.3d 401, 406 (6th Cir. 2001) (same). "This division of intermediate evidentiary burdens is not meant to stymie plaintiffs, but simply serves to 'bring the litigants and the court expeditiously and fairly to the ultimate question.'" Cline v. Catholic Diocese of Toledo, 206 F.3d 651, 660 (6th Cir. 1999), citing Texas Dep't. of Cmty. Affairs v. Burdine, 450 U.S. 248, 253 (1981).

Under this burden-shifting analysis, in order to establish a case of intentional discrimination, the plaintiff has the initial burden of establishing a prima facie case that his employer discriminated against him because of his membership in a protected class. See Beaven v. Commonwealth of Ky., 783 F.2d 672, 675 (6th Cir. 1986), citing Cooper v. Fed. Reserve Bank of Richmond, 467 U.S. 867 (1984). Then, the burden of production shifts to the defendant to articulate a legitimate non-discriminatory business reason for its action. If the defendant meets this burden, the burden then shifts back to the plaintiff to show that the defendant's reason was pretextual and that discrimination was the real reason motivating the employer's decision. See Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133 (2000).

### *Same Actor Inference*

At the outset, Defendant urges the Court to apply the same-actor inference, "which allows one to infer a lack of discrimination from the fact that the same individual both hired and fired the employee." Buhrmaster v. Overnite Transp. Co., 61 F.3d 461, 463 (6th Cir. 1995). "Although the factfinder is permitted to draw this inference, it is by no means a mandatory one, and it may be weakened by other evidence." Wexler v. White's Fine Furniture, Inc., 317 F.3d 564, 573 (6th Cir. 2003). Moreover, where "the factfinder decides to draw the same-actor

Case 3:03-cv-00768   Document 38   Filed 07/27/05   Page 15 of 27 PageID #: 15

inference, it is insufficient to warrant summary judgment for the defendant if the employee has otherwise raised a genuine issue of material fact." Id. at 573-74.

The Court does not find that the same-actor inference is warranted in this case. While Hall and Powers hired the plaintiff, Hall, Powers, and Woodard participated in the decision to terminate him. At the time of Plaintiff's termination, Hall was subordinate to Powers and Powers was subordinate to Woodard. As an additional decision-maker participated in the decision to terminate Plaintiff, one who was superior to the other decision-makers, the same-actor inference is inappropriate here.

### Prima Facie Case

In this case, Plaintiff attempts to establish a prima facie case of racial discrimination under Title VII and Section 1981 by the use of indirect evidence, thus the McDonnell Douglass burden-shifting regime applies. A plaintiff may establish a prima facie case of "discriminatory discipline" by showing that: (1) he belongs to a racial minority; and (2) for the same or similar conduct, he was treated differently than similarly-situated non-minority employees. Mitchell v. Toledo Hosp., 964 F.2d 577, 582-83 (6th Cir. 1992). The Supreme Court has noted that in comparing employment discipline decisions, "precise equivalence in culpability between employees" is not required. Id., citing McDonald v. Santa Fe Trail Transp. Co., 427 U.S. 273, 283 n.11 (1976). Rather, the plaintiff must simply show that the employees were engaged in misconduct of "comparable seriousness." Mitchell, 964 F.2d at 583 n.5; Harrison v. Metro. Gov't of Nashville & Davidson County, Tenn., 80 F.3d 1107, 1115 (6th Cir. 1996).

-16-

At the summary judgment stage, the order of proof and shifting of burdens are viewed in light of the traditional summary judgment test.  Singfield v. Akron Metro. Hous. Auth. 389 F.3d 555, 563 (6th Cir. 2004), citing Foster v. Arcata Assocs., Inc., 772 F.2d 1453, 1459 (9th Cir. 1985).  To establish a prima facie case of intentional discrimination sufficient to survive a motion for summary judgment, appellant must identify actions that, if unexplained, give rise to an inference of discriminatory conduct.  See id.  At this stage of the proceedings, the Court cannot try or resolve issues of fact; rather, it may only determine whether the plaintiff has produced evidence sufficient to support a reasonable inference of the existence of the fact at issue.  Id.

As a Black person, Plaintiff is a member of a "protected group," thus the first prong is met.  To establish the second element, Haughton must show that for the same or similar conduct, he was treated differently than similarly situated non-protected employees.  The determination of whether the conduct was the "same or similar" tends to overlap with the determination of whether the employees were "similarly situated."  The Court will rely on those factors relevant to the factual context in which the case arises -- an allegedly discriminatory disciplinary action resulting in the termination of Haughton's employment.  Ercegovich v. Goodyear Tire & Rubber Co., 154 F.3d 344, 352 (6th Cir. 1998).  Where cases concern an employer's disciplinary action, the generally relevant considerations are that "the individuals with whom the plaintiff seeks to compare his/her treatment must have dealt with the same supervisor, have been subject to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it."  Id. at 352;  Mitchell v. Toledo Hosp., 964 F.2d 577, 583 (6th Cir. 1992);  see also Singfield v.

-17-

Akron Metro. Hous. Auth., 389 F.3d 555, 562 (6th Cir. 2004).  Plaintiff must ultimately show

that the employees "engaged in misconduct of 'comparable seriousness.'"  Harrison v. Metro.

Gov't of Nashville & Davidson County, Tenn., 80 F.3d 1107, 1115 (6th Cir. 1996), cert. denied,

519 U.S. 863 (1996).

When considering whether individuals are similarly situated, "it is fundamental that to

make a comparison of a discrimination plaintiff's treatment to that of non-minority employees,

the plaintiff must show that the 'comparables' are similarly situated *in all respects.*"  Mitchell,

964 F.2d at 583 (emphasis in original).  While "[t]he plaintiff need not demonstrate an exact

correlation with the employee receiving more favorable treatment in order for the two to be

considered 'similarly-situated;' rather . . . the plaintiff and the employee with whom the plaintiff

seeks to compare himself or herself must be similar in 'all of the relevant aspects.'"  Ercegovich,

154 at 344; accord Perry v. McGinnis, 209 F.3d 597, 601 (6th Cir. 2000) ("in applying [this]

standard courts should not demand exact correlation, but should instead seek relevant

similarity").  This is a case-by-case analysis and courts "make an independent determination as

to the relevancy of a particular aspect of the plaintiff's employment status and that of the non-

protected employee."  Ercegovich, 154 F.3d at 353.

Turning to the case at hand, Haughton argues that he was treated differently than Hughes,

the White second-shift Team Leader.  Haughton argues that their circumstances were

substantially similar because Hughes engaged in similar conduct as alleged against Plaintiff, the

use of profanity.  Haughton refers to both the above-described incident with Faux that led to

Orchid's formal investigation, and the allegations of repeated employee-directed cursing and

abusive comments.

-18-

Orchid argues, however, that Hughes and Haughton are not "similarly situated." Orchid denies that it was ever informed of complaints about Hughes, other than the complaints of favoritism which prompted the above-described investigation. As to that situation, Orchid alleges that the following three circumstances differentiates Hughes' situation from Haughton's situation. First, Orchid argues Hughes was hired in a temporary capacity, while Haughton was permanently hired as a Team Leader. Second, Orchid argues that the employee complaints underlying their respective disciplinary actions were different: on the one hand, Haughton falsified subordinates' time cards, cursed at employees, threatened employees' jobs, and created an abusive environment for his employees; while, on the other hand, Hughes allegedly only showed favoritism to his brother. Third, and finally, Orchid argues that Hughes was more forthcoming with management than Haughton when facing the allegations against him.

Applying the Ercegovich factors, first, Hughes and Haughton had the same supervisor. Second, as Team Leaders, they were subject to the same standards of conduct. The third factor, whether they engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct, or the employer's treatment of them for their conduct, will therefore shape the Court's analysis.

Whether Hughes also used inappropriate language to address subordinates is only material if Orchid knew that employees had complained about Hughes' use of inappropriate language. Faux's affidavit, Christian's affidavit, and Haughton's deposition all suggest that Orchid was aware that the employees on Hughes' line had complained of Hughes' cursing at them. As discussed above, the Court will not consider either Christian's or Faux's assertion that other employees complained to Orchid. As a result, within those portions of the record, the only

evidence left for consideration is (1) Faux's general allegation that she "would routinely complain" to Hall, Powers, and McClard about Hughes' cursing and instances of talking in a derogatory manner to employees, and (2) Faux's specific allegation that she complained to Hall when Hughes said to her that he would "knock the fuck out of [her]"; and (3) Haughton's deposition testimony that he related to Hall that employees Faux, Christian, Stephanie Kimball, Daniel McElrath, and Lee Hall had complained about Hughes' cursing and other comments.

Again, only the incidents that Orchid was aware of will be material in determining whether Hughes and Haughton engaged in the same or substantially similar conduct and whether they are similarly situated. With respect to Haughton, taking all inferences in the light most favorable to Plaintiff, Orchid had learned from eight employees that Haughton had cursed at employees on his line,[2] that two employees threatened to quit if they had to continue working with him, and that Haughton had threatened to go to the NAACP if employees complained.[3] With respect to Hughes, Orchid managers had learned from Faux that Hughes repeatedly cursed and talked in a derogatory manner to employees, and had learned from Haughton that five employees reported that Hughes either cursed at them, said that Hughes controlled their job, or both.

In comparing the allegations, first, the allegations of cursing and speaking in an intimidating manner to employees as against Hughes and as against Haughton are substantially

_____

[2]The notes of each employee interview set forth a slightly different version of the incident and words Haughton used.

[3]While Haughton denies that he engaged in this behavior, he does not deny that Orchid employees reported this behavior to Orchid and that Orchid used such knowledge in making its decision to terminate him.

similar. Second, the fact that Hughes was only temporarily in the Team Leader role does not change the fact that he had the same job responsibilities and was subject to the same standards of conduct as Haughton. Defendant has neither suggested that its expectations of Hughes were different than of Haughton, nor that Team Leaders temporarily appointed were subject to different disciplinary action than permanent Team Leaders. Third, Defendant asserts that Haughton's employees reported that Haughton falsified their time cards. However, Haughton denies this fact, see Doc. No. 23 ¶ 53-59, and other than assertions in Hall's deposition, the record does not provide any independent evidence of this.

Fourth, Defendant states that it perceived that Hughes was more forthcoming than Haughton during their respective investigations and, finally, Defendant points to the fact that two individuals threatened to quit as a result of Haughton's behavior, but not as a result of Hughes. The Court does not find that these distinctions render them dissimilarly situated. In order to ensure that the "remedial purpose of the anti-discrimination statutes" is met, the Sixth Circuit does not require exact similarity because "if the non-protected employee to whom the plaintiff compares himself or herself must be identically situated to the plaintiff in every single aspect of their employment, a plaintiff whose job responsibilities are unique to his or her position will never successfully establish a prima facie case (absent direct evidence of discrimination)." Id. Likewise, some unique circumstances in the context of a disciplinary action are permissible and often inevitable; the situations simply must be of "comparable seriousness."

Viewing the evidence in the light most favorable to Plaintiff, and taking Plaintiff's allegations as true, the Court finds that Plaintiff has produced evidence sufficient to support a reasonable inference that Hughes' subordinates complained that Hughes cursed at them or spoke

-21-

to them in an intimidating or derogatory manner, and that Orchid had knowledge of such complaints. The Court finds no significant mitigating circumstances. Plaintiff has therefore met his burden with respect to both elements of his prima facie case, thus raising an inference that Defendant has engaged in unlawful discrimination.

### *Legitimate Non-Discriminatory Reason and Pretext*

If a plaintiff successfully establishes a prima facie case, the burden of production shifts to the defendant to articulate a "legitimate, nondiscriminatory reason" for his or her actions. Tex. Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 253 (1981). The defendant "need only produce admissible evidence which would allow the trier of fact rationally to conclude that the employment decision had not been motivated by discriminatory animus." Id. at 257. Orchid submits that Haughton was terminated "based on Orchid's belief, formed as a result of its investigation that Plaintiff had falsified employee time cards, cursed at employees, threatened their jobs, and created an abusive environment for his employees." (Doc. No. 23 ¶ 90). With this evidence, Orchid rebuts the inference of discrimination and the burden shifts to Plaintiff to prove that the reasons offered by Defendant were a pretext for intentional discrimination.

Plaintiff can demonstrate pretext by "showing that the employer's proffered explanation is unworthy of credence." Id. at 256; see also Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 146-49 (2000). To establish pretext, Plaintiff must show that: "(1) the stated reasons for the defendant's action had no basis in fact; (2) the stated reasons for defendant's action were not the actual reasons; or (3) the stated reasons for the defendant's action were insufficient to explain the [adverse action taken]." Sampson v. Sec'y of Transp., 182 F.3d 918 (Table),

-22-

<u>available at</u> 1999 WL 455399, at *2 (6th Cir. June 23, 1999). Under the first and third methods, "the fact finder may infer discrimination from the circumstances," while under the second method, the plaintiff "may not rely exclusively on his prima facie evidence, but instead must introduce some further evidence of discrimination." <u>Cicero v. Borg-Warner Auto., Inc.</u>, 280 F.3d 579, 589 (6th Cir. 2002) (citations omitted).

Haughton first attempts to show pretext by arguing that the employee statements that formed the basis of Defendant's reason are inadmissible hearsay and by denying that he falsified time cards.[4] According to Haughton, this demonstrates that Defendant's reason had no basis in fact. As discussed above, Defendant's reasons are not based on inadmissible hearsay statements. Moreover, whether the allegations are true or not, it is undisputed that employees made such statements to Defendant.

Second, Haughton argues that, in light of the situation with Hughes, the stated reasons for his termination were insufficient to explain the termination. Even accepting as true Haughton's version of the events as they relate to both Haughton and Hughes, Haughton has not set forth any evidence that Haughton's conduct was insufficient to warrant dismissal. In fact, Haughton admits that he used profane language toward his employees and that some form of discipline "definitely should have been imposed" for his actions with respect to the incident with Craighead and Haney. Moreover, there were some differences in Haughton's and Hughes' situations that are undisputed: for example, Haughton admits that Orchid perceived Hughes as more forthcoming than Haughton

---

[4]Haughton does not attempt to demonstrate pretext by the second method, suggesting that the stated reasons for Orchid's action were not the actual reasons. In fact, he agreed that his conduct warranted some disciplinary action and volunteered to both apologize to his team and resign from the Team Leader position in order to work as an Assembler on the assembly line.

was during their respective investigations. This difference alone, while not sufficient to render Haughton and Hughes dissimilarly situated in the context of a prima facie case, may possibly account for the difference in their disciplinary action. Regardless, the fact that Haughton was terminated for his malfeasance, while Hughes was only demoted for his malfeasance -- the only reason Haughton sets forth -- neither demonstrates, raises an inference, nor raises a question of material fact as to whether Orchid's reasons for terminating Haughton were insufficient.

"Without a showing of discrimination, a bad decision to terminate an employee will not win a Title VII case." Galbraith v. N. Telecom, Inc., 944 F.2d 275, 280 (6th Cir. 1991) (quotations omitted). An employer's nondiscriminatory decision is legitimate "even if it is mean-spirited, ill-considered, inconsistent with humane personnel policies, or otherwise objectionable." Id. Moreover, where an employer acts on a good faith belief that an employee engaged in the conduct that served as the grounds for termination, that employee cannot prevail by simply arguing that he did not engage in that conduct. If the employer honestly believed in the nondiscriminatory reason it relied on in making its employment decision, and that honest belief was reasonably based on particularized facts and not based on ignorance or prejudice, then the employer lacked discriminatory intent. Id. at 806; White v. Simpson Indus., Inc., 1 Fed.Appx. 462, 466 (6th Cir. 2001). In such a situation, summary judgment is appropriate if the employer can show it reasonably relied on the known facts when it took the adverse employment action. Galbraith, 944 F.2d at 807. In deciding whether an employer reasonably relied on the particularized facts before it, the employer's decisional process need not have been "optimal or [have] left no stone unturned. Rather, the key inquiry is whether the employer made a reasonably informed and considered decision before taking an adverse employment action." Smith v.

-24-

Chrysler Corp., 155 F.3d 799, 807-08 (6th Cir. 1998) (citations omitted). Ultimately, in order to prove intentional discrimination, the plaintiff is obligated to directly confront the employer's asserted justification for the discharge. Rowan v. Lockheed Martin Energy Sys, Inc., 360 F.3d 544, 550 (6th Cir. 2004).

In this case, however, Haughton has not put forth evidence which demonstrates that the employer did not "honestly believe" in the proffered non-discriminatory reason for its adverse employment action. See Smith, 155 F.3d at 806-07; see also Braithwaite v. Timken Co., 258 F.3d 488, 494 (6th Cir. 2001). Other than denying the vast majority of the employees' accusations, Haughton has not set forth any evidence that would tend to show, or give rise to an inference, that Orchid's stated reasons for terminating Haughton had "no basis in fact." He does not allege that Orchid acted in bad faith or that the investigation conducted by Orchid was somehow improper or questionable. Finally, he does not suggest that ignorance or prejudice caused his termination. To the contrary, in his deposition, when asked if Hall, Powers, Woodard, or McClard ever discriminated against him on the basis of race, he responded, "not to my knowledge." When asked who within Orchid discriminated against him, he responded, "I have no idea." Plaintiff offers nothing more than the fact that, on two separate occasions, two similarly-situated employees received different disciplinary actions after Orchid became of aware of similar employee complaints.

Drawing all inferences in Plaintiff's favor, the Court finds that Haughton is not able to demonstrate pretext because he has not set forth any evidence that would raise an inference from which a reasonable factfinder could find that Orchid's reasons had no basis in fact, were not the actual reasons, or were insufficient to explain Haughton's termination. Ultimately, Plaintiff has

-25-

not set forth any facts in his response to Defendant's motion for summary judgment that would raise an inference that Defendant's reason for terminating Haughton's employment was intentional racial discrimination.

**III     Other Theories of Discrimination**

Defendant asserts that Plaintiff also appears to have set forth a hostile working environment claim because during his deposition (1) Plaintiff identified "racial jokes" as an alleged type of discrimination he suffered, and (2) alleged that a temporary employee told him that she could not work for an African-American man. While different theories of discrimination are set forth in the complaint, Plaintiff's response to Defendant's motion for summary judgment states that this claim is based on a theory of disparate treatment or intentional discrimination. Morever, Plaintiff only makes arguments based on a theory of intentional discrimination and does not set forth any Accordingly, the Court does not find that Plaintiff has raised a hostile working environment claim or set forth any other theories of racial discrimination.

**CONCLUSION**

There are instances in which Black employees, Black males in particular, are subject to more severe discipline than their White co-workers for the same or substantially similar workplace misconduct as a result of intentional racial discrimination. The facts in this case do not give rise to such an inference. Plaintiff has not met his burden at the summary judgment stage to demonstrate that a reasonable factfinder may find that Orchid's reasons for terminating him were due to intentional racial discrimination. Orchid is thus entitled to judgment as a matter of law.

-26-

For the reasons stated above, Plaintiff's Motion to Consider Additional Evidence in Support of Response to Defendant's Motion for Summary Judgment is GRANTED in part and DENIED in part, and Defendant's motion for summary judgment is GRANTED.

It is so ORDERED.

Entered this the _____ day of _____, 2005.


JOHN T. NIXON, SENIOR JUDGE
UNITED STATES DISTRICT COURT